The United States Court of Appeals for the Ninth Circuit of Guam Thank you and good morning. The Court of Appeals is very pleased to be sitting in the Commonwealth of the Northern Mariana Islands this morning as part of a celebration of a great event in the history of the courts of Guam. We are pleased to be in this courtroom to hear our cases. To my right, your left, is Judge Ted Goodwin of Sisters Oregon in Pasadena, California, who is a former chief judge of our court. To my left, your right, is Judge Clifford Wallace of San Diego, who is also a former chief judge of this court. And I am Mary Schroeder from Phoenix, Arizona, and I am presently the chief judge of the United States Court of Appeals for the Ninth Circuit. And we are going to hear the cases in the order that they are listed. We noticed that the first case has been allotted ten minutes per side. We want to advise counsel that we will not strictly enforce those time limits because they are quite short. And we appreciate that fact. So with that, we will proceed to hear the case of Santos v. The People of the Territory of Guam. Mr. Heisman, you may proceed. Thank you, Your Honor, and may it please the court, we have alleged four separate grounds for reversal of the conviction in this case. The first one being the illegal interrogation and statements obtained by the Guam Police Department in violation of Miranda and related precedents. The second being the trial court's refusal to appoint a forensic pathologist. Third being unfavorable pretrial publicity, which was very, very pervasive and harmful to the defendant in this case. And the fourth, the failure to give an informer instruction in regard to the testimony of Joey Arnez, a nephew of the deceased. To begin with the first argument, the defendant was held for 19 and a half hours from the early morning hours of September the 4th until that evening, never given his Miranda warnings despite being interrogated. How long was that at the Guam, at the Ogana Precinct? It was at Tijin, which is just... I understand. How long, you didn't understand my question. Okay. He first went to the Ogana Precinct. How long was he at the Ogana Precinct? Um, I don't, that I don't know. Do you contend that the Fourth Amendment was violated at the Ogana Precinct? I believe he was seized without probable cause. Well, that isn't the point. He was asked to come down and assist the police in finding a missing 11-year-old boy who was the daughter of the woman with whom he was living. Yes. And he said he would and he came down and he said, it's okay, I didn't have anything else I was doing, I'm happy to help out. Are you indicating that during the time he was at the precinct in Ogana that he was in custody? Well, he was held 19 and a half hours altogether. I'm just focusing you on Ogana, not Tijin. Just tell me about Ogana. I believe that, no, that he began voluntarily. Okay. So at the time he's at Ogana, he signs a nine-page statement during the time he's not in custody, and this has to do essentially with finding the young lad, at least that's what they're saying. And the other family are there, but in a different part of the police station. And then he goes to Tijin. Let's grant then that that particular state violated his Fourth Amendment rights. If we do that, what was there in the nine-page statement and the discussions he held with the police officers at the Ogana precinct, which was already given to them and merely repeated at Tijin? The problem here is we can't say when he made that transference from consensual to non-consensual. I mean, by 7 o'clock in the morning, he had asked to go home. That was at Tijin. But they took him up there to check his alibi. And I've already granted you for purpose of this question that that was custodial and it was a violation of his Fourth Amendment. My question goes to how much prejudice there is. If during a non-custodial interrogation at Ogana that he's already said things, then it seems to me that there would be an argument that it was non-prejudicial that he just repeated them when he was at a place he should have had his men around his rights. So I'm asking you to identify for me the statements that were made in Ogana, which you indicate was at least at the beginning non-custodial. I would have to say that this was in the early morning hours. I don't recall exactly how much time elapsed while he was at Hagakia before being taken up to Tijin. Can you help me with this? What exactly were the statements that you claim were procured in violation of his constitutional rights? What is it that he said? Well, in this initial statement he said that he had driven to Petey with his nephew, Joey Arnaz, who was a conservation officer. And that proved to be very incriminating because Arnaz later contradicted that statement, and said, no, I wasn't there, I didn't go with him. And the mother, although her testimony was shaky, testified at trial that she had seen the young boy in the truck with him when he made this drive. So it looks very incriminating because he supposedly fabricated this story and asked Joey Arnaz to corroborate it, which eventually Arnaz refused to do. And in fact told the police that he had been asked by the defendant to corroborate this fabrication. Was there anything else in the nine-page statement that you challenged? I think that's a salient point. Yeah, and that's the problem we're having. We have no record that we couldn't go read. There was nothing in the excerpt of records that we could read. And, of course, our court rules provide that if counsel is going to rely on something, we ought to have it in front of us. And I don't know how we're going to solve these cases. We're working with Guam now to see when they'll be relieved from duty with the Supreme Court. And the Supreme Court isn't going to hear cases without a record. So we're sort of left adrift. But tell me then, assuming that the statements made in Ghana at the Ghana precinct were consensual and that the ones in Tinian were nonconsensual, custodial, what was said in that custodial context that you claimed was a violation and prejudicial to your client? Violation and prejudicial to your client. I think the point we just discussed. So that's the sum and substance of it, regardless of where it came from. That would be the incontrovertible confirmation. Yes. And then what was said after Tinian in which at least the prosecution says he repeated his statements? After Tijin? Yes. Well, the interrogation on the 13th and 14th, he was seized without a warrant, taken back to Tijin after what we maintain was physical abuse by the police. Right. And another statement. And then he did the Morano statement. Yes. And what happened there that the prosecution says that anything that occurred earlier is repeated afterwards by him? Did he repeat once more that he drove his cousin? Yes. Okay. But he added to that a very inculpatory statement that he had burned, admitting that he had burned materials in his pit up in Dededum. And that was, of course, very, very damning because the forensic pathologist examined what he found in that pit and determined that it was the remains of a young boy. So even though he was attempting to be a young boy or a young person. Young person. Yes. And putting himself at the scene of the burning like that was very, very damaging. Did anything else put him at the scene of the burning? There was testimony from neighbors that they saw him burning something in the pit. Not that they saw what he burned. But presumably that was all obtained partly as a result of his admission that he had burned something there. You mean they talked to the neighbors after he said that? Yes. Why were they asking him about it then? Well, I assume they wanted corroboration that he was there, that he burned things, and so forth. I'm not sure where the board is going with that. Well, I just, did they have already discovered the bomb? Yes. Okay. I don't think those neighbors were interviewed until long after the initial investigation. The interrogation on the 14th was done without a warrant. A pretextual search warrant was executed on the premises. One of the officers admitted in his testimony that the defendant was the real target of the raid. He was handcuffed, arrested, kicked. That cannot be sanitized with a Miranda Winger. Statements made during an illegal detention are inadmissible. And as far as the fruit of the poisonous tree argument goes, in volume three, pages 54 to 55 of the transcript, Officer Carvalito testified that they needed the second interrogation to clarify discrepancies in his earlier statements. I should have had that in my brief. I'm sorry for not doing it. But going back over the transcripts, as the court ordered us to do, brought that to my attention. Should we have C.D. Rahn's here of the entire transcript? Before you run out of time, I'd like to hear your theory of why it was prejudicial not to employ a forensic expert. What would your forensic expert have proved if you had employed one? The problem we have on Guantanamo is there's really only one forensic pathologist. He works for the government, and he works hand in glove with the prosecution on these cases. Well, they always do. The question is, if you had somebody flown over from somewhere where they have contract people, what would this expert have done for your case that you couldn't have done and didn't do on cross-examination on the government path? Well, he might have raised doubts about whether this was the remains of a young person, whether it was some other kind of bones. I'd like to point out the bones in question were only two pounds. It just seems very, very suspect that Dr. Espinola could render a definitive opinion on that point. Well, you still haven't explained to me how you could have brought Johnny Cochran's expert over from Los Angeles and what would he have said? Would he have said these are not human bones? How do we know that? I can't make that representation. I mean, my client testified that he was burning dog bones in the pit, and without someone else's expert opinion, I can't quite make the representation here. But it would be good to have someone else who could look at the same material and see if his conclusion is the same. Well, when did your client come up with the story that he was burning dog remains? Most people give a dog, if they care about the dog, they give it as a burial. But when he came up with the story that he was burning up a dead dog, was that at the T. John interrogation or earlier? It would have been at the September 14th interrogation at T. John. So what was incriminating in that testimony was the fact that he was probably lying about what he was doing at that fire pit. Not what kind of bones they were. I mean, a forensic expert couldn't have helped you on that unless he said they were dog bones. Possibly. Well, I'm trying to get at the prejudice. In order to, in this kind of a case where you're bringing an appeal from a, in the form of a habeas type appeal, raising federal constitutional questions, you have to show that if an error was made in a discretionary call like appointing a forensic expert, you have to show that it prejudiced the client to the extent of denying him a fair trial. So that's what I'm hoping you'll tell us. Well, without an expert opinion to combat Dr. Espinola's opinion, I don't know. Well, but I guess the problem is that we're here, are we here on habeas? No, we're in assert. We're in assert, so we're directly reviewing. Okay, that's what I thought. So you're telling us that there's nothing in this record. Now, if we were, if you were, if your client is correct and they were really dog bones, theoretically the time to argue that you were denied due process because there was no expert appointed is after you have somebody find out that they really were dog bones and then file a habeas petition, I suppose. Theoretically, is that right? I mean, it's kind of hard for us to do it. I understand the point. Yeah, it's kind of hard for us to do it. I understand the point. What you're saying is you have to go outside the record. You have to demonstrate that the trial judge abused his discretion in failing to grant you the expert, and it's very difficult on the record we have before us to show that because you point out, used the term might, it might have, but that doesn't show he abused his discretion or there was any prejudice. So we're having difficulty on direct review to see how we could reverse it based upon abuse of discretion standard. Okay. You've used your time. We'll give you a couple minutes for rebuttal anyway if you'd like to say anything in closing or you may reserve some time. I'll reserve. All right. Thank you. We'll give you two minutes for rebuttal. Thank you. We will hear from the people of the territory of Guam. Ann Keith with the government. Thank you, Your Honor, and may it please the Court. Our first argument, of course, is that the Supreme Court erred when it found that the initial statements were taken in a custodial setting, and we went to great lengths to show that there was no custody at that initial interview. When you say initial interview, you were working with the Agana priest, right? I have, in the brief, treated it as one interview, but, yeah, particularly the Agena interview was not in the study. Convenience me. I've been treating it as two. I assume you would say when he said, I'm happy to help out, I've got plenty of time, it's my girlfriend's son, that that was consensual and that the nine-page statement was consensual and he wasn't in custody. But then you take the second step where he's transferred to Tinian, is that how it's pronounced? And at that time, he's taken up there, not according to the record, to help finding the son, Hoy, but to verify his alibi. So the police are in a different mode. They've now focused on him. They now believe, according to the record, at least some of the police officers believe, that there had been foul play, and this was the number one suspect, and he's taken up there for 19 hours and questioned. And then even at one point, he says, I want to go home, and they say, no, you can't go home. You have to talk to two more police officers, and he doesn't go home until two hours later. Now, is it really the position of Guam that that was not custodial? If, okay, we can break it down into three. There were, at 7.50 p.m., he said, I want to go home and take a shower. But the transcript reveals that it is not that he was prevented from going home, but that he acquiesced to later statements. Officer Hertzlet testified that, I walked out, and I believe that Officers Bellitto and Cruz approached me, because they were in the hallway, and they asked to speak to him, and I said, well, it's up to you. He wants to go. So I believe they just entered in on him. That's what Officer Hertzlet said. Where was the point, though, with the testimony where the police officer said you can't go until two more police officers interview you? I think that the transcript shows that it was more, you know, we'd like to interview you. Regardless of that, the government didn't use anything that happened between 7.50 p.m. and 9.30 when he got home. None of that was used in the conviction of him in any event. What was used of the Tinian discussions at all in this case? Well, it's our theory that the statement was introduced into evidence, that statement that was taken at the Gagnon Precinct. The only evidence that was used for teaching was used as impeachment. It was used simply to show the non-credibility of the defendant, because his statements were later proven to be untrue, as you know. So the only statement used in trial as inculpatory was the statement taken at the Gagnon Precinct. I understand the Supreme Court thinks there's a difference between inculpatory and non-inculpatory. I haven't completely agreed with that yet. My mind is open. So let's not limit it. What statements were taken up there and used in the trial? I don't believe that. In Tijin, there were no statements used. None. So the only statements that were used in the third, fourth ones that came out of the Gagnon Precinct? The only written statement, yes. No, I didn't say written. I said any statement. Yes, the only statement, yes. And you did not use any of them in Tinian? Not the statements on the 4th of September. Wait a minute. At the second part of the interrogation at Tinian, none of those were used? That's right. Okay. We didn't have the record. I didn't know. Where was the statement taken that contained his failed alibi, the alibi that his nephew was living, and that would prove whether it was, or the nephew testified whether it was false? That was taken at a Gagnon first thing in the morning? At a Gagnon first interview. My name is not in custody. That's right. And I think he may have repeated that on September 13th when he was an official suspect, but it's our position that he'd waived his Miranda rights by then. There's been no effective attack, as the Supreme Court held, there's been no effective attack on those later waiver of the Miranda warnings. Well, if his statement at the Gagnon precinct was not in custodial interrogation, it doesn't matter whether he waived his Miranda rights, does it? If it's non-custodial, they're looking for a missing child. He volunteers to help them. He gives them a phony alibi statement. It turns out later that the jury starts to disbelieve him when they find out that he gave this phony alibi statement. Then he comes up with this phony story about burning a dead dog, and the jury isn't notified of that either. These are all incriminating, but that dog-burning story didn't come out in the Gagnon precinct, did it? Oh, no. That's much later. Exactly. The Gagnon precinct story happened before he even burned the body. He still had the body stored at the P.E., at the auto shop in P.E. at the time he was giving the bullet. Now he had just finished transporting it up to Dedekind, and he had not burned it yet. This was all happening while he was busy getting ready to dispose of the body. So his first custodial interrogation was that 13 hours or so that he was at the other precinct at the tea shop. Yes. Well, we don't contend it was custodial, but the Supreme Court found that it was. Well, they said it was, and they said it was error, and they said it was harmless error. And we agree with that, too, because everything that he said that was found later to be false, or everything that he said in general, was later found from an independent source. And we think that the Supreme Court was right in applying the independent source doctrine. But you don't need to get to an independent source doctrine if the original statement's okay. So you're buying more of a burden than you may have to. And as I understand it, you did use statements of the September 13, 14, and September 16. But in those, it's position of government that he was given a Miranda statement, and it's a valid Miranda statement. Yes, and that the Supreme Court found that no effective attack on those Miranda statements had been launched. He argues now that he was coerced, but there's no evidence of coercion. There were no cuffs after the raid was completed. The warrants were not pretextual. Actually, the record reveals that there was a warrant to look for evidence on the murder of Herman Santos. That's an officer Herzlitz testimony in the trial. One of the officers testified that he was the target of the raid. Now, I'd assume, reading the briefs, that he's just in with a relative at the wrong time, and the relative's place got busted, and everybody sitting there is going to get thrown on the floor and cuffed. But what about the statement of a police officer that he was really the target of that raid? And, in fact, the warrants and the affidavits in support of the warrants didn't make it into the record. But Officer Herzlitz did testify that, in fact, two warrants were being executed that morning. One warrant was to look for evidence in the stabbing of Herman Santos. The other warrant being simultaneously executed was to look for drug paraphernalia that the brother had. And that's in Officer Herzlitz' testimony. So your position is either way, by the time he got to the police headquarters, he was fully given his Miranda rights and voluntarily waived them, regardless of what happened before? Regardless of what happened. Because, if you'll read the transcript, he had still adopted that, the helpful, outwardly helpful persona. He was not cuffed. He was taken to the hospital and given nothing more than ibuprofen. The record shows that. And so there was nothing that could have affected his volition, and that affected those statements. Could I ask about the publicity? The Appellant's Counsel made quite a point about the need for a change of venue. And I wonder if you could help us understand, has the Territorial Court ever granted a change of venue to take the case off-island if there's publicity in the local media? No. And this, I think, is probably the most interesting issue on appeal. And even the Supreme Court noted it in footnote 13 that, and, in fact, it would be our position, if granted, that there is no court that could properly exercise jurisdiction over this. And this is an interesting Guam issue, because what, it is an offense against the territory of Guam, and what court properly has jurisdiction? Change of venue often takes place under a statute in California. Now, there is authority that you can grant a change of venue even where there's no statute. So I'm not persuaded. That wouldn't be an impediment. But what court could be forced to accept jurisdiction? And the government would also like to offer a unique historical case that I found involving Oklahoma when it was a territory, and that's the case of Mahaffey v. Territory found at- I'm not sure I can find it. Okay. Let me ask you this. In connection with the change of venue, is it really a matter of the court, or is it a matter of the location? I'll start with the location. There's one superior court of Guam. How many places does it sit in Agaña? Is there any courtroom, any place else in Guam? One was once built in Tumar to house a large commercial case, and the parties had to finance the dilemma, but no. And, in fact, isn't it a right to a fair jury? Yeah. Yeah, it's the jury pool. It's the jury pool. It's out of whack. Yes. It's out of whack. Okay. There's nowhere else to get to. It shows in BDM, I look like. Absolutely, in KUAM. And they were fascinated by the story in the early stages and had lots of publicity. But the trial- Well, what was the time delay between the time of the crime and the planning of the trial? Crime took place over Labor Day weekend in 1999.  And the federal court found and the Supreme Court agreed that the heat had boiled down and that the publicity had not gone. There was not a continuous stream of publicity during that interval. Is that correct? Yes, that a fair and impartial jury could have been found. Is there any other place in the United States or other territories that has a similar situation? I was thinking of Washington, D.C., but I was only able to find federal cases in Washington, D.C., and on the federal level it's very different. And I didn't find this case in Washington, D.C. on the local level. But like I say, this Oklahoma case says in any event that the Sixth Amendment right was not meant to apply to territories. So that's another very interesting issue, that if we had gotten to the change of venue, we would have argued that there's nowhere for it to go and that the Sixth Amendment right wouldn't have applied to the territories in any event. In the process of this motion for change of venue, did the defendant waive his right to be tried by a jury of his peers? I don't believe so. I mean, if you transferred it to San Diego for trial, the first argument on appeal would be, I wasn't tried by a jury of my peers, and I just wondered whether or not that issue came up and whether the defendant waived it. It didn't. And the other issue is how the San Diego court would have to accept it. Just, I mean, there's no statutory authority under which they could try this case in any event. The Supreme Court was, you'll note that they were frustrated that we didn't get to these issues because they're interesting. But in any event, this case wasn't the right case to test them on, and we certainly think they were correct about that. I think we've been a little over one question. Do you want another minute? I wanted to point out with respect to the informer instruction that we're relying on the case authority that we used in our brief that as long as you give other instructions regarding credibility of witnesses, and we did give Instruction 4D and Instruction 4I, and, of course, all of Joy Arnaz's testimony was corroborated, except as the defendant pointed out the testimony about the alibi, that that wasn't direct evidence. That wasn't in the chain of guilt that Santos established. And we would also point out that as to declining to allow him to spend public funds to allow him to hire a forensic pathologist, the law of Guam allowed him to go hire his own. And, in fact, since, as the panel correctly noted, collateral review is available, it is his option to get funds to examine those bones even now. But at the time, there was no evidence in the record that they were anything but human bones. So I think that the Supreme Court did not hear when it upheld the finding of the Superior Court. I have one question. Do we now have the total record on CD-ROM? You have the transcripts. I mean the transcript, yes, that's what I have in mind. I'm sorry to say that the exhibits are still, but the transcript we have on YouTube. We do have the transcript on CD-ROM, and that is where now? That is with the District Court of the CNMI. Okay. And then the only other thing we have, of course, is finding it in there, and these documents that both parties have filed will lead us to that, we hope. Yes. Yes. And if you didn't, we'll let you know so you can try it over. Yes. Then the other thing is the statements that were signed. Are they in the – they are not in the excerpt. I wondered if we have copies of those, especially the one that was signed, the initial ones. Right. I think this is a problem because I did ask the Supreme Court for exhibits, and they reported that they actually never had physical custody of them. And I went to the Superior Court and asked for the transcript. As you know, they said that they mistakenly thought the case was over, and they destroyed the transcript. And so I didn't dare ask for the exhibits. I have full copies. I imagine counsel does, but we have a copy of all the exhibits. If you have any trouble representing the government of Guam to get the exhibits which were the statements that he signed, if you'll let us know, I'm sure we can enter an order. We have to get this straightened out. We have to have the materials if we're going to properly review Supreme Court. So if you have a problem with that within two weeks, would you let us know? Otherwise, we'll expect that the statements can be sent to the clerk of our court in San Francisco. Would a supplemental excerpt of record by both parties suffice? Anything you want to do is fine. We just want the statements. Yeah, I believe that those written statements are critical to this case. We do too. I will conclude by just saying that I really think the prosecutor put on a powerful and convincing case of circumstantial evidence in this case. The jury was permitted to and then did infer that this defendant, Anthony Santos, murdered and hid, then burned the body of Herman Santos. So we ask this court to reverse the initial finding of custody to the effect that we don't believe it was custodial, but otherwise we're simply asking for all the convictions to be affirmed. Thank you. May it please the court, thank you for the rebuttal time. The court asked if there were any other jurisdictions with similar problems. I would point out that the Virgin Islands is somewhat similar. There is a case cited in my opening brief, El Vocero de Puerto Rico, which discusses this problem in regard to Puerto Rico rather extensively. It didn't result in a reversal, but it did go into, and it's a United States Supreme Court case. I would point out that there is only one place where the Superior Court says the entire island of Guam is only 32 miles long. The publicity was island wide. I would have to say that in response to another question that the defendant's moving to have the case tried in another jurisdiction would have to be deemed a waiver in some way of his right to be tried by citizens and residents of Guam. As for the testimony of Joey Arnaiz, it is not all corroborated. Joey Arnaiz, there was a third person in the van when they drove the body, supposedly up to Dededo or Chico. That person owned the van. He just let them use it. He had no idea what was in it. That was Anthony Concepcion. Also, there were parts of his testimony that were not corroborated, such as the request by the defendant to corroborate a phony alibi. There was a statement made by the defendant to Mr. Arnaiz who asked him, well, if you had a problem with Daisy, why didn't you kill Daisy instead of Daisy's son? The defendant supposedly replied, because I don't care, using an obscenity. Mr. Arnaiz's testimony is inherently problematic, because he was held by the police 36 hours, made things up, admitted making things up. He was definitely, definitely an informer. Let me ask you a question there. We usually think of informers as people that are paid by the police to go and ingratiate themselves with the target defendant. I didn't see anything in the record that he's an informer. I understand he's a cooperative witness and he didn't help your client any. But what was there in the record that indicate he's an informer? That is, that for some remuneration of some type, he had been placed there by the police to get information. Well, he had nothing like that. He did testify pursuant to a plea agreement. He pled guilty to hindering apprehension for his role in taking the body up to Dededo and received two years' probation. He received that benefit. Also, he was hoping to keep his job in law enforcement, which is going to be very hard. Was that brought out at cross-examination? Yes. Let me ask you another question. Counsel for Guam said that none of the statements taken in Tinian on September 3 or 4, 3-4, were put into evidence. Is that your understanding, too? No, not at all. What statements were taken in Tinian, September 3-4, that were put into evidence? The written statement and additional details that came out orally that were not in the written statement, little things. Like? Oh, I'm trying to remember. Where do we find those? Excuse me? Where do we find those? Those would be in the testament. If you look at the material that we submitted, then it will be. . . I think I did a fairly thorough job of outlining where the statements are. Okay, so you disagree with. . . you're at this area. Absolutely. And I would like to point out that the Tijin, the later Tijin statements on the 13th and the 14th were tape-recorded. The tapes were played into evidence. That, too, is noted in the material that I submitted. Okay, I think that you've used your time. Okay. I want to thank the panel very much. The court will order this matter submitted for decision with the understanding that the parties are to file copies of the written statements with the court in San Francisco within two weeks of today's argument. Thank you. Is that acceptable? Thank you. All right. We'll proceed to hear the next case for argument, Saganya v. Tenorio.
judges: Schroeder, Wallace Goodwin